[Cite as *State v. Labriola*, 2013-Ohio-2604.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | |

| STATE OF OHIO | C.A. No. 12CA0030-M |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| VINCENT E. LABRIOLA | COURT OF COMMON PLEAS COUNTY OF MEDINA, OHIO |
| Appellant | CASE No. 11CR0350 |

DECISION AND JOURNAL ENTRY

Dated: June 24, 2013

CARR, Judge.

**{¶1}** Appellant Vincent Labriola appeals his conviction in the Medina County Court of Common Pleas. This Court reverses and remands.

I.

**{¶2}** Labriola was indicted on one count of complicity to commit arson in violation of R.C. 2923.03(A)(1) and 2909.03(A)(1), a felony of the fourth degree. He pleaded not guilty and the matter proceeded to trial. At the conclusion of trial, the jury found him guilty, and the trial court sentenced him to three years on community control. Labriola appealed and raises three assignments of error for review. This Court considers the assignments of error out of order to facilitate review.

II.

**ASSIGNMENT OF ERROR II**

THE TRIAL COURT ERRED AS A MATTER OF LAW BECAUSE THE STATE FAILED TO ESTABLISH ON THE RECOR[]D SUFFICIENT

EVIDENCE TO SUPPORT A [COMPLICITY TO COMMIT ARSON][1] CHARGE IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS 1, 10 & 16 OF THE OHIO CONSTITUTION.

{¶3} Labriola argues that the State failed to present sufficient evidence to sustain his conviction. This Court disagrees.

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Galloway*, 9th Dist. No. 19752, 2001 WL 81257 (Jan. 31, 2001) quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶4} The test for sufficiency requires a determination of whether the State has met its burden of production at trial. *State v. Walker*, 9th Dist. No. 20559, 2001 WL 1581570 (Dec. 12, 2001); *see, also*, *State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997) (Cook, J., concurring).

{¶5} Labriola was convicted of complicity to commit arson in violation of R.C. 2923.03(A)(1) and 2909.03(A)(1) which state that "No person, acting with the kind of culpability required for the commission of an offense, shall * * * [s]olicit or procure another to, by means of fire or explosion, [] knowingly * * * [c]ause, or create a substantial risk of, physical harm to any property of another without the other person's consent[.]" "A person acts knowingly, regardless

---

[1] Labriola assigned as error in the text of the second assignment of error the State's failure to present sufficient evidence of a violation of a protection order charge. Labriola was not charged with such offense in this case. Because he later argued in regard to the proper charge of complicity to commit arson, this Court presumes that the recitation of the assignment of error contains a typographical error.

of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). "Physical harm to property" is defined as "any tangible or intangible damage to property that, in any degree, results in loss to its value or interferes with its use or enjoyment." R.C. 2901.01(A)(4).

{¶6} Labriola does not dispute that Steven Combs committed arson by setting fire to an outbuilding/barn on Chad Barco's property. He argues that the State failed to present sufficient evidence that he knowingly solicited or procured Combs to burn the barn.

{¶7} Chad Barco testified that he owns property on Wadsworth Road in Montville, on which existed, prior to the arson, a single-family home, two outbuildings, and one cabin. While away from home, he received notice that one of his outbuildings had been burned down during the late evening hours of May 20, 2011, and that the police had Steven Combs in custody for the suspected arson.

{¶8} Mr. Barco testified that, early in the day on May 20, 2011, he, his brother-in-law Ryan Sweeney, his friend Chris Adam, and Labriola drove to southern Ohio to meet two others and to camp overnight, and then participate in a four-wheeler event on May 21, 2011. Prior to leaving for the event, Labriola arrived at Mr. Barco's home in an old, white, full-size van, which he left at the Barco residence. Mr. Adam drove Mr. Barco and Labriola to the campsite. Mr. Barco testified that there was limited cell phone reception at the campsite.

{¶9} After camping overnight, Mr. Barco went up a nearby hill where the cell reception was better to check his messages. He had received a text message the night before from his wife and sister-in-law, telling him that he needed to call the Montville Police Department. He testified that he called the police and was informed that one of the structures on

his property had burned down. The police officer further asked him if he knew a Steven Combs whom the police apprehended in a Volkswagen near the scene. Although he did not recognize the last name, Mr. Barco testified that he knew that a Steven, whom he had met once in passing, worked for Labriola. He also knew that Labriola routinely drove a Volkswagen that was registered in his mother's name.

{¶10} Mr. Barco testified that he returned to the campsite and told only Labriola, Mr. Adam, and Mr. Sweeney what had happened. After stating that the only Steve he knew was the one who worked from Labriola, Mr. Barco asked, "What's that about?" Mr. Barco further commented on the report that Steven Combs had been apprehended near the scene while driving a Volkswagen registered in a woman's name. While Labriola remained very quiet as the others discussed the situation, Mr. Barco testified that Labriola soon admitted that he had Steve Combs burn down Mr. Barco's barn because he was trying to do Mr. Barco a favor.

{¶11} Mr. Barco testified that the barn was in cosmetically poor condition although it was structurally sound. He testified that he had the building insured and that it was worth more than $1000.00. He asserted that he did not give Labriola, Combs, or anyone else permission to burn his structure, and that he never told Labriola that he needed a new barn. Mr. Barco further testified that he did not derive any benefit from the burning of the building. In fact, he testified that the burned building created a safety hazard consisting of nails and debris. In addition, he testified that the zoning code prohibits him from constructing a replacement building unless he removes the other two structures from his property first. Mr. Barco testified that he did not write a note that was left at the scene under a beer can.

{¶12} Chris Adam's testimony regarding the events and discussions on May 20 and 21, 2011, was consistent with Mr. Barco's testimony. Mr. Adam confirmed that Labriola arrived at

Mr. Barco's residence in a van and that he, Mr. Barco, and Labriola rode together to southern Ohio in Mr. Adam's truck. Mr. Adam testified that, when Mr. Barco informed their group on May 21, 2011, that someone had burned down his barn, Labriola remained quiet for a while but ultimately said, "I had him burn the f***er down."

{¶13} Ryan Sweeney's testimony also consistently corroborated the testimony of Mr. Barco and Mr. Adam. He testified that on the evening of May 20, 2011, Labriola volunteered to gather everyone's cell phones and put them in the truck so they would be protected from the moisture in the night air. Mr. Sweeney testified that his wife informed him the next morning that someone had burned down Mr. Barco's barn and that the police had a suspect named Steve in custody. Although Mr. Sweeney did not know anyone named Steve, he knew that Labriola hired a Steve to help in his construction business. Mr. Sweeney testified that he also knew that Labriola and Steve had traded cars for the weekend, so he questioned Labriola. Mr. Sweeney testified that Labriola eventually admitted that he told Combs to burn Mr. Barco's building.

{¶14} Terry Grice, the current chief of police for Montville Township, testified that he was a police sergeant called to investigate an emergency call regarding a structure fire at 11:40 p.m. on May 20, 2011, on Mr. Barco's property. Chief Grice testified that, on his way to the scene, he passed two other police officers who had pulled over a motorist for a traffic stop. When he arrived at the scene, he noticed a van parked in the driveway near the house and a structure behind the house that was fully engulfed in flames. After the flames were extinguished, only a portion of the southeast corner of the structure remained; the rest was charred rubble. Authenticated photographs of the scene depict the total destruction of the building. The police determined that the van in the driveway was registered to Steven Combs.

{¶15} Chief Grice testified that another officer at the scene directed him to evidence found on a covered back porch. On a table by the door was a note secured by an unopened can of Budweiser beer which was specially packaged for the upcoming patriotic holidays. The handwritten note read, "Suck my nigga dick! In yo' face Punk! This "Bud" is 4-U… Bitch!" Based on the note found at the scene, the chief testified that he suspected arson.

{¶16} Chief Grice testified that he returned to the scene the next day and spoke with Mr. Barco who told him that Labriola admitted that he had Steven Combs burn the building. Based on that conversation, the chief asked Mr. Barco to come to the police station for a further interview, and Mr. Barco agreed. Mr. Barco informed him that the barn was insured for its $16,000 replacement value. Chief Grice admitted that he was initially concerned about the possibility of insurance fraud, but he was satisfied by Mr. Barco's denial when asked whether he had asked anyone to burn the building.

{¶17} Officer Bret Harrison testified that he stopped a Volkswagen Jetta around 11:40 p.m. on May 20, 2011, because the car had no lit tail lights. He stopped the car approximately 200 yards north of Mr. Barco's property. He identified the driver as Steven Combs, although the titled owner was a woman. Officer Harrison testified that Combs had difficulty opening the car window, so he opened the car door to speak to the officer. Officer Harrison testified that he smelled an odor of an alcoholic beverage emanating from the car, and he saw numerous Budweiser beer cans, some open and some not, in the cup holders and other places inside the passenger compartment. The cans had a red, white, and blue American flag pattern on them. The officer testified that he had never seen beer cans with that particular design before. He later testified that the cans in the Volkswagen matched the can found on the table on Barco's covered porch with the note.

{¶18} Officer Harrison also testified that he smelled a strong odor of gasoline emanating from inside the car. As he was conducting the traffic stop, the officer heard a dispatch call regarding a structure fire at the location of Barco's property.

{¶19} Based on the smell of alcohol, Combs' slurred speech, glassy eyes, and his fumbling manner with the car window, Officer Harrison arrested Combs for operating a vehicle while under the influence of drugs or alcohol. The officer searched the car and found a 12-pack container for Budweiser beer, 5 full cans and 5 empty cans of Budweiser beer, several lighters, matches, rubber gloves, and a cell phone. A search of Combs revealed another lighter.

{¶20} Officer Harrison identified the beer cans found in the car and read the "born date" from the bottom of several cans. He testified that the "born date" on the bottom of the matching can found at the scene of the fire had been scratched off. The officer testified that he contacted the Budweiser company on May 23, 2011, and a company representative informed him that the cans found in the car and at the scene of the fire had not been released to the public at that time and were not scheduled to be released for another two weeks in time for Memorial Day.

{¶21} Officer Harrison testified that he obtained a search warrant to search the contents of Combs' cell phone. He testified that a text message was sent from Combs' phone to "V…" at a phone number later confirmed by Labriola to be his cell phone number. Combs had saved the number under the name "Vincent." The message was sent at 11:19 p.m. on May 20, 2011, and stated: "…& the Lord said: 'Let there be light'. Hence, done deal, M.F'r!"

{¶22} Officer Harrison testified that he spoke with Labriola on his cell phone based on a number he obtained from Mr. Barco. Labriola told him that he knew and worked with Combs and that Combs was driving Labriola's mother's car but that it was the car that Labriola used as his own.

{¶23} Reviewing the evidence in a light most favorable to the State, this Court concludes that any rational trier of fact could have found that the essential elements of the charge of complicity to commit arson were proved beyond a reasonable doubt. *See Jenks*, 61 Ohio St.3d at paragraph two of the syllabus. The State presented evidence that Combs set fire to Mr. Barco's barn without Mr. Barco's permission. There was evidence that Labriola knew Combs, that they had traded vehicles during the time of the arson, that Combs sent Labriola a text message soon after starting the fire indicating that it was a "done deal," and that Labriola admitted to three people that he had asked Combs to set the fire. Accordingly, the State presented sufficient evidence of the crime of complicity to commit arson. Labriola's second assignment of error is overruled.

## ASSIGNMENT OF ERROR I

THE PROSECUTOR'S REMARKS DURING CLOSING ARGUMENT AND FAILURE TO PROVIDE ALL EVIDENCE ROSE TO THE LEVEL OF PROSECUTORIAL MISCONDUCT WHICH DEPRIVED MR. LABRIOLA OF HIS RIGHT TO A FAIR TRIAL IN VIOLATION OF HIS 5TH, 6TH, AND 14TH AMENDMENT RIGHTS UNDER THE U.S. CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.

{¶24} Labriola argues that he was denied his constitutional right to a fair trial based on improper conduct by the State. This Court agrees.

{¶25} Labriola first argues that the State's repeated comments during closing argument about his lack of credibility and other witnesses' credibility deprived him of a fair trial.

{¶26} Although the State is generally accorded a certain degree of latitude during closing argument, "[t]he prosecutor is a servant of the law whose interest in a prosecution is not merely to emerge victorious but to see that justice shall be done. It is a prosecutor's duty in closing arguments to avoid efforts to obtain a conviction by going beyond the evidence which is before the jury." (Internal citations omitted.) *State v. Smith*, 14 Ohio St.3d 13, 13-14 (1984). As

an initial matter, the State "must avoid insinuations and assertions which are calculated to mislead the jury." *Id.* at 14, citing *Berger v. United States*, 295 U.S.78, 88 (1935).

{¶27} This Court has adopted the Ohio Supreme Court's test in evaluating a claim of prosecutorial misconduct arising during closing argument. We must determine "whether the prosecutor's remarks were improper and, if so, whether the remarks prejudicially affected the defendant's substantial rights." *State v. Kirby*, 9th Dist. No. 23814, 2008-Ohio-3107, ¶ 23, citing *Smith* at 14. Specifically, a prosecutor may not express any opinion as to the credibility of a witness or as to the defendant's guilt. *Kirby* at ¶ 23. For example, the Ohio Supreme Court has concluded that comments by the State referring to the defendant's evidence as "lies," "garbage," and "[a] smoke screen" went "well beyond the normal latitude allowed in closing arguments and [was] clearly improper." *Smith*, 14 Ohio St.3d at 14. A reviewing court focuses not merely on the culpability of the prosecutor, but rather considers the trial record as a whole to determine whether the defendant received a fair trial. *Kirby* at ¶ 23, citing *State v. Lott*, 51 Ohio St.3d 160, 166 (1990).

{¶28} During closing argument, the State repeatedly commented on Labriola's testimony as untruthful, implausible, and full of lies. For example, in comparing Labriola's testimony to that of other witnesses, the assistant prosecutor asserted: "You only heard that from Mr. Labriola who, by the way, his testimony is untruthful and I'll point out a lot of ways why it's untruthful." Labriola objected to this statement, arguing that the prosecutor "has no idea whether it's truthful or not. That's misleading." When directed by the trial court to rephrase, the State continued by asserting that "this man right here, Vincent Labriola, his testimony is full of mistruths and lies. It's clear as it can be and that's my argument to you." Later, the State informed the jury: "You heard what I call and what I submit to you is false testimony of the

Defendant * * *."  The assistant prosecutor asserted that Labriola's "excuses" were "implausible" and that he "in fact, lied."  The State argued that "if * * * you're Vincent Labriola, and I submit to you a liar as he has been throughout this case when he testified, you think up another lie for that * * *."

{¶29}  In addition, the assistant prosecutor commented on Labriola's explanations, stating that "[t]hat affects his credibility.  You don't accept every story."  The State even went so far as to effectively inform that jury that they must either believe or discount all testimony from any single witness.  The State argued that Labriola wanted the jury to believe the State's witnesses as their testimony aligned with his but not when it did not: "That's not the way it works.  That's not the way human beings work.  That's not the way that 12 people that are peers that are deciding the case decide credibility."

{¶30}  In his rebuttal argument, the assistant prosecutor asserted that the State did not present the testimony of Steven Combs because it did not want "to parrot your lies * * *."  In conclusion, the assistant prosecutor told the jury that the State "has been an honest broker of the evidence in this case[,] * * * characterizing the evidence in a more believable fashion."

{¶31}  Finally, the State commented on the credibility of some of its witnesses, going so far as to emphasize the witnesses' traits to bolster their credibility.  After recapping the testimony of Chris Adam and Ryan Sweeney, the assistant prosecutor stated: "I suggest to you that they were very credible in their testimony.  Frankly, they're very likeable and straight forward."

{¶32}  This Court concludes that the assistant prosecutor's repeated comments about Labriola's untruthfulness crossed the line into impropriety.  *See Smith*, 14 Ohio St.3d at 14.  Moreover, we conclude that the State's repeated and egregious misconduct prejudicially affected Labriola's substantial rights so as to deprive him of a fair trial.  Even after being directed by the

trial court at one point to rephrase, the assistant prosecutor only more emphatically called Labriola a liar. In fact, the crux of the State's argument was that Labriola lied under oath, while the State's witnesses told the truth. Under the circumstances of this case, the State's misconduct deprived Labriola of his constitutionally protected right to a fair trial. Thus, as the State's remarks prejudicially affected the defendant's substantial rights and undermined the integrity of the proceeding, Labriola's first assignment of error is sustained.

## ASSIGNMENT OF ERROR III

MR. LABRIOLA'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE [] IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS 1, 10 & 16 OF THE OHIO CONSTITUTION.

{¶33} In his final assignment of error, Labriola argues that his conviction is against the manifest weight of the evidence. Because our resolution of the first assignment of error is dispositive of this appeal, this Court declines to address the third assignment of error dealing with the weight of the evidence as it is rendered moot. *See* App.R. 12(A)(1)(c).

III.

{¶34} Labriola's first assignment of error is sustained. Labriola's second assignment of error is overruled. This Court declines to address the third assignment of error as it is moot. The judgment of the Medina County Court of Common Pleas is reversed and the cause remanded for further proceedings consistent with this decision.

Judgment reversed,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellee.

DONNA J. CARR
FOR THE COURT

BELFANCE, P. J.
WHITMORE, J.
CONCUR.

APPEARANCES:

DAWN M. KING, Attorney at Law, for Appellant.

DEAN HOLMAN, Prosecuting Attorney, and MATTHEW A. KERN, Assistant Prosecuting Attorney, for Appellee.